IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JACQUELINE ELLINGTON, on behalf )
of C.K.S., )
           )
        Plaintiff, )
           )
      v. )     CIVIL ACTION NO. 2:12cv259-TFM
           )             (WO)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
           )
       Defendant. )

## OPINION

## I. PROCEDURAL HISTORY

The plaintiff, Jacqueline Ellington ("Ellington"), filed this lawsuit on behalf of her

child, C.K.S., challenging a final judgment by Defendant Michael J. Astrue, Commissioner

of Social Security, in which he determined that C.K.S. is not "disabled" and, therefore, not

entitled to child supplemental security income benefits.  On May 26, 2009, Ellington filed

on behalf of C.K.S. an application for supplemental security income benefits.  Ellington's

application was denied at the initial administrative level.  The plaintiff then requested and

received a hearing before an Administrative Law Judge ("ALJ").  Following the hearing, the

ALJ determined that C.K.S. is not disabled. The Appeals Council rejected a subsequent

request for review.  The ALJ's decision consequently became the final decision of the

Commissioner of Social Security ("Commissioner").[1]  *See Chester v. Bowen*, 792 F.2d 129,

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No.
103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social

131 (11th Cir. 1986).   The parties have consented to the undersigned United States Magistrate Judge rendering a final judgment in this lawsuit.  The court has jurisdiction over this lawsuit under 42 U.S.C. §§ 405(g) and 1383(c)(3).[2]  Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED.

## II.  STANDARD OF REVIEW

An individual under 18 is considered disabled "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 1382c(a)(3)(C)(I) (1999).  The sequential analysis for determining whether a child claimant is disabled is as follows:

1.    If the claimant is engaged in substantial gainful activity, [s]he is not disabled.

2.    If the claimant is not engaged in substantial gainful activity, the Commissioner determines whether the claimant has a physical or mental impairment which, whether individually or in combination with one or more other impairments, is a severe impairment.   If the claimant's impairment is not severe, [s]he is not disabled.

3.    If the impairment is severe, the Commissioner determines whether the

Security matters were transferred to the Commissioner of Social Security.

[2] Title 42 U.S.C. §§ 405(g) and 1383(c)(3) allow a plaintiff to appeal a final decision of the Commissioner to the district court in the district in which the plaintiff resides.

> impairment meets the durational requirement and meets, medically equals, or functionally equals in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies this requirement, the claimant is presumed disabled.

*See* 20 C.F.R. § 416.924(a)-(d) (1997).

The Commissioner's regulations provide that if a child's impairment or impairments are not medically equal, or functionally equivalent in severity to a listed impairment, the child is not disabled. *See* 20 C.F.R. § 416.924(d)(2) (1997). In determining whether a child's impairment functionally equals a listed impairment, an ALJ must consider the extent to which the impairment limits the child's ability to function in the following six "domains" of life: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1279 (11th Cir. 2004); 20 C.F.R. § 416.926a(b)(1). A child's impairment functionally equals a listed impairment, and thus constitutes a disability, if the child's limitations are "marked" in two of the six life domains, or if the child's limitations are "extreme" in one of the six domains. *Shinn*, 391 F.3d at 1279; 20 C.F.R. § 416.926a(d).

In reviewing the Commissioner's decision, the court asks only whether his findings concerning the steps are supported by substantial evidence. *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). Substantial evidence is "more than a scintilla," but less than a preponderance: it "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec., 3*63 F.3d 1155,

3

1158–59 (11ᵗʰ Cir. 2004) (quotation marks omitted).  The court "may not decide the facts

anew, reweigh the evidence, or substitute . . . [its] judgment for that of the [Commissioner]."

*Phillips v. Barnhart,* 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004) (alteration in original)

(quotation marks omitted).  The court must, however, conduct an "exacting examination of

the [Commissioner's] conclusions of law." *Martin v. Sullivan,* 894 F.2d 1520, 1529 (11th

Cir. 1990).


### III. INTRODUCTION

#### A.  The Commissioner's Decision

C.K.S. was 10 years old at the hearing before the ALJ.  (R. 37.)  The plaintiff alleges

that, on May 15, 2009, C.K.S. became disabled due to autism.  (R. 114.)  The ALJ, in his

opinion, followed the regulations' three steps as listed above when he analyzed C.K.S.'s

claim.  After doing so, he concluded that C.K.S. is not disabled and, therefore, denied his

claim for supplemental social security benefits.  Under the first step, the ALJ found that

C.K.S. is not engaged in substantial gainful activity.  At the second step, the ALJ found that

C.K.S. has severe impairments of separation anxiety disorder; dysthymic disorder; enuresis;

oppositional defiant disorder; anxiety disorder, not otherwise specified; disruptive behavior

disorder; learning disorder, not otherwise specified; and attention hyperactivity disorder

("ADHD"). (R. 19.)  The ALJ also found C.K.S. has a non-severe impairment of asthma.

(*Id.*) At step three, the ALJ found that C.K.S.'s impairments, when considered singularly or

in combination, do not meet or medically equal in severity the criteria for any impairment

4

listed at 20 CFR, part 404, Subpart P, Appendix 1.  (R. 14-15.)

In addition, the ALJ concluded that C.K.S.'s impairments do not functionally equal a Listing.  (R. 20-30.)  Specifically, the ALJ found that C.K.S. has less than marked limitation in acquiring and using information, attending and completing tasks, and caring for himself.  (R. 27, 29-30.)  The ALJ also found that C.K.S. has no limitation in the domains of health and physical well-being and moving and manipulating objects.  (R. 29-30.)  He further determined that C.K.S. has "a marked limitation in interacting and relating with others."  (R. 28.)  The ALJ concluded that C.K.S. does not have an extreme limitation in one area of functioning, nor does he have a marked limitation in two areas of functioning.  (R. 30.)  Consequently, the ALJ determined that C.K.S. is not disabled.  (R. 31.)

## B.  The School Records

School records indicate that C.K.S.'s behavioral problems have steadily increased since beginning his elementary education.  *See Ellington v. Astrue*, Civ. Act. No. 2:07cv789-CSC, Doc. No. 18 (M.D. Ala., April 2008).[3]

---

[3] In *Ellington v. Astrue*, the court summarized C.K.S.'s behavioral problems at school as follows:

C.S. began attending school at T.S. Morris Elementary School but was transferred to Highland Gardens Elementary School due to behavioral problems.  (R. 90).  When C.S. was in the first grade, the Montgomery Public School system referred him for evaluation due to "[b]ehavior issues [which] included: hitting, flipping over table, running out of classrooms and the building when frustrated and violent temper tantrums."  (R. 91).  At the time of the evaluation, C.S. was taking Lithium and Risperdal for ADHD, Psychotic Disorder, and Intermittent Explosive Disorder.  (*Id*.).  Testing indicated that C.S. cognitive abilities were in the low average range.  Consequently, he did not qualify for special education services.  (R. 101).

On September 15, 2008, school officials documented the following accommodations:

504 Plan implemented for ADHD and Intermittent Explosive Disorder. [C.K.S.] received accommodations to his environment, organization, and presentation, as well as motivational accommodations.  In addition, he had a

---

On March 18, 2005, C.S.'s kindergarten teacher completed a teacher questionnaire. (R. 64-76).  She noted that C.S. had an obvious problem waiting his turn, changing activities without being disruptive, and working without distraction.  (R. 69).  He had a number of problems daily attending and completing tasks.  (*Id.*)  He also had an obvious problem daily of interacting and relating to others.  (R. 70).  Specifically, he struggled with playing cooperatively with others, making and keeping friends, seeking attention and expressing anger appropriately and following rules.  (*Id.*).  Finally, he had an obvious problem caring for himself in that he did not handle frustration appropriately nor was he patient.  (R. 73). C.S. had no problem moving about or manipulating objects.  (R. 72).  Her added comments were compelling.

> [C.S] takes away from the learning climate in my classroom.  He does not listen at all!  He is constantly hitting, punching, kicking, and slapping other children.  His behavior is very disruptive.  [C.S.] has to sit isolated from the rest of the children.  Sometimes medication does not seem to help!

(R. 75).

The school's discipline log for the 2005-2006 school year indicates that C.S. had difficulty from the beginning of school.  On August 15, 2005, he fell on the floor, and kicked chairs and students.  (R. 143).  On August 16, 2005, C.S. "ran out of the classroom, kicking the walls in the hallway, falling on the floor, crying."  (*Id.*).  On August 17, 2005, C.S. left his classroom and fell on the floor kicking and screaming in the hallway.  (*Id.*).  On August 18, 2005, C.S. kicked chairs and desks in the classroom.  (*Id.*).  On August 19, 2005, C.S. threw a chair.  (R. 142).  On August 22, 2005, C.S. punched a student in the nose hard enough to cause the child's nose to bleed.  (*Id.*).  In September, C.S. "threw chairs around the room, and he picked up a desk and threw it at [a female student].  [H]e also walked over and pushed [a male student.]" (*Id.*)  As a result of this incident, a parent-teacher conference was held on September 6, 2005, and C.S. was scheduled for behavioral counseling.  (R. 144).

On January 5, 2007, C.S.'s first-grade teacher at the alternative school completed a teacher questionnaire for the period of October 2005 to May 2006.  (R. 125-127). According to this teacher, "[C.S.] interacted with [her] fine.  [She] did have behavior problems when he decided he was ready to go home."  (R. 125).  She noted that C.S. "would have sudden violent outbursts in class" and "was suddenly aggressive with his classmates. He liked to make them afraid of him."  (R. 126).  This teacher believed that C.S. " wanted to stay home . . . because he was afraid his parents might die.  He learned that if he behaved badly or ran out of the school building he would be suspended and get to stay home."  (*Id.*). She does not delineate the basis for her beliefs about C.S.'s behavior.

*Ellington v. Astrue*, Civ. Act. No. 2:07cv789-CSC, Doc. No. 18, R. 10-12 (M.D. Ala., April 2008)

behavior intervention plan.  The 504 and behavior intervention plans were unsuccessful. [C.K.S.] has received 5 suspension days this year.  In addition he has been out of school since early December for running away from campus and evading campus administrators throughout the surrounding neighborhood.  As a result of the most recent incident, the school system has decided that [C.K.S.] is going to receive homebound instruction.

(R. 146.)

In 2009, C.K.S. was evaluated for special education services.  (R. 145.)  In their Notice and Eligibility Decision, the IEP Team summarized the results of several intelligence and behavioral tests, including Autism Diagnostic Observation Schedule performed on April 24, 2009, which indicated "Communication + Social Interaction Total of 11 falls within the Autism range for educational diagnosis of Autism" and the results of a Gilliam Autism Rating Scale -Second Edition performed on March 12, 2009, which indicated standard scores of 74 and 109.  (R. 145-148.)  Upon reviewing the results of testing, classroom observation, and work samples, the IEP Team determined that C.K.S. was eligible to receive special education services for his specific learning and mental health problems.  (R. 150.)

On October 30, 2009, a school committee conducted a parent-teacher conference and hearing concerning accusations that C.K.S. brought a knife to Floyd Elementary School.  (R. 160-162.)  During the proceeding, the committee reviewed C.K.S.'s test results, including a "MEDC report indicat[ing] BASC-2 scores in the critical range over all and for externalizing behaviors, Autism Eligible."  (R. 160.)  After the hearing, a school committee "determined that alternative placement for a period of 45 days [in an] alternative educational setting" was appropriate.  (R. 162.)

On January 6, 2010, C.K.S.'s parents met with the IEP team for a parent-teacher conference at Fews Elementary.  (R. 159.)  A school official's notes indicate that C.K.S.'s parents were concerned about him running away from both home and school, and that running, throwing objects, and excessive cursing continues to be a problem.  (*Id.*)  It was also noted that Dr. Owens suggested "parent shadowing" and found that C.K.S. reports hearing voices.  (*Id.*)  The school official recommended that a case manager meet with C.K.S. once a day in the morning and that progress reports be sent home daily.  (*Id.*)

On January 20, 2010, the IEP team conducted a parent conference with the plaintiff.  (R. 158.)  The conference initiator noted, "Mom is shadowing [C.K.S.] daily.  Mom has concerns about shadowing [and] child becom[ing] dependent of mother."  (*Id.*)  During the meeting, the IEP team advised that a social skills story would be prepared to assist C.K.S. during his transition to Floyd Elementary.  (*Id.*)

In February 2010, C.K.S. was reevaluated for special education services.  (R. 153-155.)  The IEP team determined C.K.S. was eligible for 30 minutes of social skills instruction by a special education teacher at least once a week, 30 minutes of instruction in a special education classroom once a day, 30 minutes of counseling services in the school counselor's office at least once a week, 30 minutes of crisis intervention training once a week by a school counselor.  (*Id.*)  The team also concluded that C.K.S. "will follow a 'chain of assigned personnel' to provide support and a 'cool down' location. . . . These contacts may be utilized up to 3 times per day.  If [he] requires additional time in a 'cool down setting' he will spend the remainder of the day with resource teacher or other special education staff." (R. 153.)

8

An Individualized Education Program was implemented for the 2010-2011 school year. The IEP team found as follows:

[C.K.S.] is currently in the fourth grade at Harrison Elementary School. He is in a Behavior Unit with accommodations to his core subjects. Carl's area of disability is Autism. Records from Behavioral Medicine of Montgomery indicate that [C.K.S.] has [been] diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), Psychotic Disorder, and Intermittent Explosive Disorder. According to his medical records his medication has not been effective and new medications are being tried. At this time he is exhibiting aggressive behaviors toward peers and staff during class instructional time. Due to [C.K.S.'s] disturbing he has difficulty focusing and remaining on task during school time. [C.K.S.] has been experiencing difficulty achieving grade level academic content standards in the area of math. [C.K.S.] is making progress towards achieving his current IEP goald and mastery is anticipated by the end of the fifth grade. When [C.K.S.] is on task, he takes great pride in his work and has indicated that reading is his favorite subject. All tasks assigned are generally completed without assistance from the teacher. He can finish most tests without additional time. During class time, [C.K.S.] does not get along with his classmates. In fact, he has to be separated at times from his peers. If [C.K.S.] thinks one of his peers is smiling, laughing, or looking at him, he will immediately go into a combative mode, regardless of the age or grade level of the students. [C.K.S.] sometimes becomes aggressive and loses self control. He has been restrained on occasions to ensure the safety of his peers and himself. Test scores indicate [C.K.S.] is experience difficulty in the area of math. . . . The IEP team has made the recommendation that [C.K.S.] will continue to receive instruction in a Behavior Unit. The purpose of this unit is to redirect his behavior by teaching him daily social skills that will help him make good decisions when he disagrees with his peers and teachers. A functional behavior assessment will be used to address all behaviors. [C.K.S.'s] mother is very involved with his academic work. She spends much of her time monitoring and assisting [C.K.S.] while at school. Her presence has helped [C.K.S.] to stay focused on his lessons and follow school rules. The classroom aide has assisted with [C.K.S.] to help him remain on task. EXTREME THREATS and INTIMIDATION toward peers and teachers are a concern of [C.K.S.'s] mother and the IEP team. A special IEP conference was held on 4/13/2010. The IEP team decided that due to continued behavioral concerns that interfere with the safety of [C.K.S.], that [C.K.S.] receive homebound services for a period of 4 hours per week for the remainder of the school year. The alternative

educational setting was the homebound placement. . . .

(R. 172-173.)

On August 30, 2010, Lamon Dees, a special education teacher, completed a teacher questionnaire, in which he indicates that C.K.S. has "a very serious problem" with working without distracting himself or others, playing cooperatively, making and keeping friends, seeking attention appropriately, expressing anger appropriately, relating experiences and telling stories, using language appropriate to the situation and listener, respecting and obeying authority, and introducing and maintaining relevant and appropriate topics of conversation on an hourly basis.  (R. 177-178.)  Mr. Dees also indicated that C.K.S. has "a very serious problem" with handling frustration appropriately, being patient, using good judgment regarding personal safety and dangerous circumstances, identifying and appropriately asserting emotional needs, responding appropriately to changes in own mood (e.g., calming self), and using appropriate coping skills to meet daily demands of the school environment.  (R. 181.)  Mr. Dees noted that C.K.S. requires a personal aide to protect him from hurting himself and "if you are not sitting by him he will become violent/combative with peers and teacher without any warning."  (R. 176, 178.)

## C.  The Medical Records

The medical records indicate that C.K.S. has received mental health treatment on a routine basis at Montgomery Area Mental Health Authority throughout most of his childhood.  C.K.S.'s mental health problems have steadily worsened over time.  For example,

on February 12, 2009, a safe school therapist at Montgomery Area Mental Health Authority, Erania Norman, noted that C.K.S. "has been out of school since Dec[ember] 5 [for] leaving the school [and] said voices told him to leave – said people were getting in his face. School worried for his safety." (R. 203.) On February 23, 2009, Kayln Lane, a psychologist, noted that C.K.S. "said that voices told him to leave [school]," that he has "mood swings that result[] in disruptive behaviors – throwing desks, yelling and uncontrollable behaviors," and that he admits to auditory and visual hallucinations. (R. 199.) Specifically, C.K.S. reported that "[he] hears voices in [his] mind that tell [him] to throw stuff" and that "he always complies." (R. 241.) The psychologist diagnosed C.K.S. as suffering from ADHD, Oppositional Defiant Disorder ("ODD"), and Anxiety Disorder Non-Specific, and recommended ruling out Psychotic Disorder and Learning Disorder. (R. 199.)

During individual counseling with the therapist on March 17, 2009, C.K.S. indicated that he wanted to see his friends and be in the classroom. (R. 233.) On March 23, 2009, the therapist contacted the principal for Peter Crump Elementary to discuss C.K.S.'s return to school. (R. 232.) According to the therapist's notes, the principal advised her that C.K.S. should remain at home because he "is a behavior risk for other students." (*Id.*) On April 7, 2009, the therapist met with the principal of the school. (R. 229.) The principal indicated that C.K.S. was not zoned for his school, but that he had allowed C.K.S. to attend as a favor to his mother. (R. 229.) The following day, the therapist discussed the problem with the plaintiff. The therapist noted that "Ms. Ellington stated to therapist that she was more concerned with [C.K.S.] receiving SSI benefits than w[ith] him returning to school." (R.

11

228.)  She further noted that she was "confused by parent's statement and reminded her that [C.K.S.] needed school for academic and socialization purposes" and that the plaintiff "was not clear on her change of 'attitude' regarding [C.K.S.] returning to school."  (R. 228.)

On April 20, 2009, Dr. Lane met with the plaintiff and C.K.S.  (R. 226.)  The plaintiff reported that C.K.S. had two outbursts, including one incident where he became angry and threatened to hang himself.  (*Id*.)  The psychologist recommended that C.K.S. continue therapy sessions and take a full dose of Lexapro and increased his prescription for Risperdal.[4] (*Id*.)  During a therapy session on April 21, 2009, C.K.S. reported that he missed his school. The therapist advised him that he would have to remain on homebound status for the rest of the year due to the principal's request.  (R. 225.)

On May 6, 2009, the therapist contacted the plaintiff to determine the time of the next IEP meeting.  (R. 223.)  Upon learning that she had missed the meeting, the therapist "expressed deep disappointment with mother [for] not contacting [her] with info to attend meeting.  Mrs. Ellington did not seem concerned about this issue – she was more pleased with discussing the 'new' info to share with SSI office for [C.K.S.].  Results from MPS testing concluded that [C.K.S.] has been diagnosed with Autism (Asperger's)."  (*Id*.)

On May 11, 2009, C.K.S. returned to Dr. Lane's office for an evaluation.  Dr. Lane

---

[4] Risperdal is the brand name of the generic drug Risperidone, which is used for the treatment of schizophrenia, acute or mixed episodes of bipolar I disorder, as well as for "treatment of irritability associated with autistic disorder in children and adolescents 5-16 years, including symptoms of aggression toward others, deliberate self-injuriousness, temper tantrums, and quickly changing moods."  *See* http://pdr.net/drugpages/concisemonograph.aspx?concise=606.

noted that C.K.S. would return to school in the Fall with special education services, that his speech was sparse but with good eye contact, and that he should continue taking his medication and going to therapy sessions.  (R. 220.)

During a family therapy session on June 9, 2009, the therapist noted that "in-depth school testing resulted in his diagnosis of Autism" and that he would be placed in a traditional classroom setting.  (R. 218.)  She also noted that "Mrs. Ellington continued to comment on wanting SSI benefits for [C.K.S.].  Therapist continued to redirect parent to focus on purpose of session."[5]  (*Id.*)

During a visit with Dr. Lane on June 22, 2009, the plaintiff reported that "things are going pretty good," but that C.K.S. continues to become easily frustrated and angered.  (R. 215.)  Dr. Lane increased his prescription for Risperdal and recommended that he continue taking Lexapro.  (R. 215.)

On June 24, 2009, the therapist met with C.K.S. for an individual session.  (R. 213.)  C.K.S. reported that he was "not doing well with focusing and being able to feel calm" and that "he really tries but it is hard for him to stay in one place or be able to stay focused."  (*Id.*)

During a visit on July 20, 2009, Dr. Lane noted the plaintiff reported that [C.K.S.] was

---

[5] The court recognizes that the mental health records indicate that the plaintiff was more focused on receiving social security benefits after her son received an educational diagnosis of autism than the purpose of the family counseling sessions.  The records, however, also indicate that the therapist's focus was more on counseling the mother than in treating the child.  Each therapy session lasted no more than thirty minutes and there are few notes indicating that the therapist personally discussed behavior problems with C.K.S. More importantly, the mother's enthusiasm about a diagnosis of autism and a desire for the Social Security Commissioner to recognize the severity of her child's mental health problems is somewhat understandable, especially given that she must sit next to C.K.S. all day while he is in school to prevent him from hurting himself or others.

"doing pretty good," but that he has "outbursts and pouts when he does not get his way." (R. 211.)  The psychologist noted that C.K.S. was selectively mute and his affect was flat.  (*Id.*)  Dr. Lane recommended that C.K.S. stop taking his medications at night and that he continue with his afternoon dosage of Risperdal and therapy.  (*Id.*)  On August 24, 2009, the plaintiff reported to Dr. Lane that a teacher allowed another student to hit C.K.S.  (R. 208.)  In addition, C.K.S. reported that he is scared when he is alone and that sometimes "he sees his dad and is afraid he'll take him with him."  (R. 208.)  Dr. Lane recommended that C.K.S. continue with his medication and therapy sessions.  (*Id.*)

On September 19, 2009, Dr. Guy J. Renfro, a consultative psychologist, conducted an evaluation of C.K.S.  (R. 243-245.)  Dr. Renfro noted that C.K.S. did not display autistic behavior and had good speech development, as well as a tendency to interact appropriately with people.  (R. 244.)  However, he also noted that C.K.S. appears to suffer from significant fears of being left alone or abandoned and requires someone to be in the bathroom while he takes a bath.  (R. 245.) In addition, Dr. Renfro found that C.K.S.'s affect was depressed and that his reasoning and social judgment were moderately impaired.  (R. 245.)  Dr. Renfro assessed separation anxiety disorder, severe; disruptive behavior disorder, NOS; dysthymic disorder; enuresis; and learning disorder NOS.  (R. 246.)  After this consultation, however, C.K.S.'s behavior continued to worsen.

During an evaluation on September 28, 2009, Dr. Lane noted that C.K.S. flipped a table and two chairs in the school counselor's office and ran away from school two or three times over the past week.  (R. 278.)   In addition, she found that C.K.S. was reluctant to talk

and his speech was "very sparse." (*Id*.)  Dr. Lane recommended that he continue his medications and increased his prescription for Resperdal.  (*Id*.)

On November 16, 2009, C.K.S. returned to Dr. Lane reporting that he was transferred to FEWS Elementary for 45 days because he brought a six-inch buck knife to school.  (R. 277.)  Dr. Lane noted that C.K.S. was "now walking out of school when he gets angry [and] tries to leave to go home" and that his affect was blunted.  (*Id*.)  Dr. Lane advised C.K.S. to continue taking Lexapro, increased his prescription for Risperdal, and encouraged him to follow a healthy diet and exercise.  (*Id*.)

On March 4, 2010, C.K.S. returned to Montgomery Area Mental Health Authority complaining of "things crawling in his head" after he takes his medication.  (R. 275.)  In addition, the plaintiff reported to the counselor that C.K.S. had an "episode" at Harrison Elementary School and that the teachers helped him calm down by walking.  (*Id*.)

On March 15, 2010, C.K.S. met with a psychiatrist at Montgomery Area Mental Health Authority.  (R. 274.)  Dr. Chilli noted that C.K.S. was irritable, angry, and uncooperative and that he "has been showing escalating behaviors at home and school." (*Id*.)  During the evaluation, C.K.S. ran out of the psychiatrist's office and onto the road. (*Id*.)  The psychiatrist found that C.K.S.'s insight was extremely impaired, recommended that he continue with his current medications, and attempted to place him into the psychiatric hospital for treatment.  (*Id*.)  Ellington, however, "refused placement stating that she needs to discuss [with] her husband."  (R. 273.)  When the safe school coordinator from Montgomery Area Health Authority called to discuss the incident with Ellington, C.K.S.

answered the phone and explained that he ran away from the office because "he didn't know the doctor and he was afraid of him when he told his [mother] to go out and leave him."  (R. 272.)

On April 22, 2010, the counselor and the plaintiff discussed C.K.S.'s behavior.  (R. 269.) The counselor's notes indicate the following:

> [Ellington] shared that [C.K.S.] has been on home bound school since April 14.  He got up from his seat and said that someone was getting into his face and bothering him/he was hearing voices during class.  Client ran out of building/school yard and the police caught him on a street not far from his house.  The school felt he was a danger to himself and put him on homebound until he could get stabilized.  She can appeal next school year to the school board.

(*Id.*)

On May 3, 2010, Kortite Pringle, a safe school therapist, met with C.K.S. for individual therapy. (R. 267.)  C.K.S. "expressed that the voices returned when he stopped taking medication" and that "the voices often told him to run out of the classroom or get out of his seat and not to listen to the teacher."  (*Id.*)   On that same day, Dr. Lane completed a physician's service report, specifically noting that C.K.S. "will jump up in the middle of class and run out of school" and that "auditory voices tell him to run and hurt himself."  (R. 268.) She diagnosed C.K.S. as suffering from "Psych NOS" and adjusted the dosage of his Risperdal and Lexapro.   (*Id.*)  Dr. Joseph McGinn, a board-certified psychiatrist at Montgomery Area Mental Health Authority, also completed a residual functional mental health assessment form, in which he found that C.K.S. has extreme impairments in the ability to acquire and use information and the ability to interact and relate with others, as well as

16

marked impairments in the ability to attend and complete tasks and in the area of health and physical well-being. (R. 259.) Dr. McGinn noted that C.K.S. "hears voices that compel him to run or to harm himself or with paranoid content . . . other elevation in mental funding began [at about] 5 [years old] now progressed to extreme degree." (*Id*.)

During a session on May 17, 2010, Dr. Lane noted that C.K.S. made odd sounds which were "non-verbal but phonic" while playing with a writing board. (R. 262, 282.) She noted that C.K.S. was on homebound from school because he ran out of a school building while hearing voices. (*Id*.) She diagnosed C.K.S. as suffering from ADHD combined type; Oppositional Defiant Disorder; and Anxiety Disorder NOS. (*Id*.)

### III. ISSUES

The plaintiff presents the following issues for this court's review:

(1)    The Commissioner's decision should be reversed, because the ALJ failed to accord adequate weight to a treating psychiatrist, Dr. McGinn.

(2)    The Commissioner's decision should be reversed, because the ALJ's functionality findings lack support of substantial evidence.

(Pl's Br., Doc. # 12, p. 4.)

### IV. DISCUSSION

The plaintiff raises several issues and arguments related to this court's ultimate inquiry of whether the Commissioner's disability decision is supported by the proper legal standards and by substantial evidence. *See Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987). However, the court pretermits discussion of the plaintiff's specific arguments because the

court concludes that the Commissioner erred as a matter of law, and thus, this case is due to be remanded for further proceedings.  Specifically, the court finds that the Commissioner's decision is not supported by substantial evidence and is due to be remanded for further proceedings.

### A.  Failure to consider the Listings

Social Security regulations provide a three-step sequential analysis for determining whether a child is disabled. 20 C.F.R. § 416.924(a).  First, the Commissioner must determine whether the child is engaged in substantial gainful activity.  *Id*.  If yes, the child is not disabled, but if not, the Commissioner must then proceed to the second question, which is whether the claimant has a severe impairment.  *Id*.  If not, the child is not disabled.  *Id*.  If yes, *the Commissioner then must consider the third step, whether the child has an impairment that meets, medically equally, or functionally equals the Listing of impairments*.  *Id*.  If the child satisfied a listing, the child is conclusively disabled.  *Id*.

*Gibbs v. Barnhart*, 130 Fed. Appx. 426, 428-29 (11th Cir. 2005) (emphasis added); *Henry v. Barnhart*, 156 Fed. Appx. 171, 173 (11th Cir. 2005) (emphasis added).

The ALJ found that C.K.S. has not engaged in substantial gainful activity and that he has severe impairments.  C.K.S. has been diagnosed and treated for ADHD, ODD, Psychotic Disorder NOS; Separation Anxiety Disorder, severe; Disruptive Behavior Disorder, NOS; Dysthymic Disorder; Learning Disorder NOS, and Anxiety Disorder NOS.  In addition, C.K.S. receives medication for the treatment of autism and school officials have determined he is autism-eligible.

Step three requires a three-tiered approach to determining whether the child has an impairment that meets, medically equals, or functionally equals the Listing of impairments. First, the ALJ must consider whether C.K.S. *meets* a Listing. 20 C.F.R. § 416.924(a); *Johnson*, 148 Fed. Appx. at 840. "To 'meet' a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002). Next, the ALJ must consider whether C.K.S.'s impairments *medically equals* the Listings. 20 C.F.R. § 416.924(a). To medically equal a listing, there must be in the record "medical findings that are at least equal in severity and duration." *Johnson*, 148 Fed. Appx. at 841-42. Finally, if the ALJ concludes that C.K.S. does not meet or medically equal a Listing, the ALJ must determine whether C.K.S. *functionally equals* a Listing by considering the six domains of functional limitations set forth in the regulations. *See Henry*, 156 Fed. Appx. at 173-74.

The required level of severity for Listing 112.11, Attention Hyperactivity Disorder , is met when there is a medically documented finding of marked inattention, impulsiveness, and hyperactivity coupled with a finding of at least two marked impairments in age-appropriate functions of congitive/communicative, social functioning, personal functioning, or concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P App. 1, Listing 112.11. Although the ALJ recognized C.K.S. suffers from ADHD, the ALJ failed to properly consider whether he meets or medically equals this Listing.

The required level of severity for Listing 112.03, Schizophrenic, Delusional

19

(Paranoid), Schizoaffective, and Other Psychotic Disorders, is met when there is medically documented persistence, for at least six months, of delusions or hallucinations or catatonic, bizarre, "other grossly disorganized behavior," or incoherent, illogical thinking, or loosening of association, or poverty of speech content, or flat, blunt or inappropriate affect, or emotional isolation, apathy, or withdrawal, resulting in a finding of at least two marked impairments in age-appropriate functions of cognitive/communicative, social functioning, personal functioning, or concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P App. 1, Listing 112.03. The record is replete with references to C.K.S. hearing voices telling him to do things, such as to run out into the street. (R. 146, 159, 199, 241, 259, 268-269, 274-275, 277.) In addition, the mental health records indicate that, during almost every counseling session, C.K.S.'s affect is flat or blunt and his speech is sparse. (R. 211, 220, 245, 267, 277-278.) The ALJ, however, did not specifically consider whether C.K.S. meets or medically equals this Listing.

The required level of severity for Listing 112.08, Personality Disorders, is met when there is "[d]eeply ingrained, maladaptive patterns of behavior, associated" with seclusiveness or autistic thinking, pathologically inappropriate suspiciousness or hostility, oddities of thought, perception, speech, and behavior, persistent disturbances of mood or affect, pathological dependence, passivity, or aggressiveness, or intense and unstable interpersonal relationships with impulsive and exploitative behavior resulting in a finding of at least two marked impairments in age-appropriate functions of cognitive/communicative, social functioning, personal functioning, or concentration, persistence, or pace. 20 C.F.R. Pt. 404,

Subpt. P App. 1, Listing 112.08.  The record is replete with references to C.K.S.'s anger, violence, temper, and aggression.  (R. 159-162, 172-173, 176-178, 181, 226, 274, 277-278.) Although the record indicates C.K.S. has been diagnosed as suffering from Psychotic Disorder, the ALJ failed to consider whether C.K.S. meets or medically equals this Listing.

More importantly, the ALJ did not resolve inconsistencies and fully develop the record to determine whether C.K.S. meets Listing 112.10 for Autistic Disorder and Other Pervasive Developmental Disorders.  Listing 112.10 imposes the following requirements:

> Characterized by qualitative deficits in the development of reciprocal social interaction, in the development of verbal and nonverbal communication skills, and in imaginative activity.  Often, there is a markedly restricted repertoire of activities and interests, which frequently are stereotyped and repetitive.

> The required level of severity for these disorders is met when the requirements for both A and B are satisfied.

> A.  Medically documented findings of the following:

> 1.  For autistic disorder, all of the following:

> a.  Qualitative deficits in the development of reciprocal social interaction; and

> b.  Qualitative deficits in verbal and non-verbal communication and in imaginative activity; and

> c.  Markedly restricted repetoire of activities and interests;

> OR

> 2.  For other pervasive developmental disorders, both of the following:

21

> a.  Qualitative deficits in the development of reciprocal social interaction; and
>
> b.  Qualitative deficits in verbal and non-verbal communication and in imaginative activity;
>
> AND
>
> B.  . . . [F]or children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraphs B2 of 112.02.

20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, Listing of Impairment 112.10.

School records demonstrate that, at some point during the 2009-2010 school year, a "MEDC report indicated BASC-2 scores in the critical range over all and for externalizing behaviors, Autism Eligible." (R. 160.) In addition, the IEP team's notes reference an Autism Diagnostic Observation Schedule performed on April 24, 2009, indicating "Communication + Social Interaction Total of 11 falls within the Autism range for educational diagnosis of Autism." (R. 145-148.) The medical records from Montgomery Area Mental Health Authority also indicate that "in-depth school testing resulted in [a] diagnosis of Autism" (R. 218.) These specific tests, however, are not included in the record.

The notes of the consultative psychologist, Dr. Renfro, conflict with other evidence in the record indicating that C.K.S. suffers from autism. In September 2009, Dr. Renfro noted that C.K.S. did not display autistic behavior and had good speech development, as well as a tendency to interact appropriately with people during the evaluation. (R. 244.) After this consultation, however, C.K.S.'s behavior at school and at home worsened considerably. In addition, records from Montgomery Area Mental Health are replete with references to

C.K.S.'s reluctance to talk, sparse speech, and non-verbal sounds.  (R. 211, 220, 245, 262, 267, 277-278, 282.)  The medical records also indicate that C.K.S. has been routinely prescribed Risperdal, a medication used to treat the symptoms of autism in children, throughout most of his childhood.  Despite the worsening of C.K.S.'s behavioral problems after the initial consultative evaluation in September 2009 and evidentiary materials referencing autism, the ALJ failed to resolve inconsistencies in the record concerning a diagnosis of autism or another mental health impairment which meets the Listings.

In light of the numerous references to C.K.S.'s behavioral problems throughout the record, an educational diagnosis of autism, and medical records indicating C.K.S. is routinely prescribed medication specifically formulated for the treatment of autism, the court concludes that the ALJ must further develop the record concerning whether C.K.W. meets or medically equals Listing 112.10 for autism or another mental health impairment which falls under Listing 112.00.

Without reference to any particular Listing, the ALJ found that C.K.S.'s impairments do not meet or medically equal a listed impairment.  He fails to give any explanation for this finding.  Instead, the only explanation set out in the ALJ's opinion is a discussion of the six domains of functional limitations which must be considered in determining functional equivalence.  It appears to the court that the ALJ conflated the analysis which must be made in step three; that is not proper.  *See e.g. Shinn ex rel Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004) (Discussion showing that the "meet," "medically equal," and "functionally equivalent" inquiries are distinct.). Step three's three-tiered approach requires

23

the ALJ to evaluate each tier individually to determine whether C.K.S. *meets, medically equals,* or *functionally equals* the Listings.  This the ALJ failed to do.  Consequently, the court cannot determine whether the ALJ's determination that C.K.S. is not disabled is supported by substantial evidence.

Furthermore, even if the court were to find that the ALJ properly completed the first two tiers of the three step analysis, *i.e.* whether C.K.S. met or medically equals the Listings, the court concludes that, at a minimum, the ALJ's analysis at the third tier of step three that C.K.S. does not "functionally equal" the Listings is flawed and not supported by substantial evidence.

By considering the six domains of functional limitations, the ALJ concluded that C.K.S. "does not have an impairment or combination of impairments that results in either 'marked' limitations in two domains of functioning or 'extreme' limitation in one domain of functioning."  First, the ALJ found that C.K.S. has less than a marked limitation in acquiring and using information.  (R. 24.)  In reaching this conclusion, the ALJ discounted the opinion of C.K.S.'s special education teacher as follows:

> . . . [T]he undersigned has considered the Teacher Questionnaire from Mr. Dees (Exhibit B13E).  In doing so, the undersigned notes that Mr. Dees opined that the claimant has problems in multiple domains.  However, Mr. Dees noted that the claimant has a personal aide and the IEP noted that the claimant's mother often attends the classroom as well to assist the claimant.  Mr. Dees himself noted that the claimant becomes violent/combative with peers and the teacher *if someone is not sitting with him*, but the record suggests that the aide or the claimant's mother always accompanies the claimant.  With the added assistance, it seems highly unlikely that the claimant functions within the limitations opined by Mr. Dees; this is supported by the notation on the IEP that states the claimant is more focused on his lessons and school rules with

> the presence of the mother and the aide (Exhibit B13E).  Therefore, the
> undersigned gives only some weight to the opinion of Mr. Dees.

(R. 25.)  The ALJ's reason for rejecting the findings of Mr. Dees rests upon faulty logic.

Because a professional and/or a parent must assist C.K.S. in the classroom at all times in

order for the him to remain focused on a lesson, it is logical to conclude that C.K.S.'s ability

to acquire and use information on his own is at least markedly to severely limited.

The ALJ also found that C.K.S. has marked limitations in interacting and relating with

others.  (R. 28.)  The record is replete with references to C.K.S.'s inability to get along with

other students and teachers.  For example, C.K.S. has been disciplined for bringing a knife

to school, sent to alternative school or placed on homebound status throughout the school

year, and received crisis-intervention training on a weekly basis.  (R. 153, 159, 160-162.)

In addition, an IEP team noted C.K.S. "exhibiting aggressive behaviors toward peers and

staff during class instructional time" and that "running, throwing objects and excessive

cursing continue to be a problem,"  and the special education teacher reported that "if you

are not sitting by him he will become violent/combative with peers and teacher without any

warning." (R. 176, 178.) Given the overwhelming evidence of C.K.S.'s aggressive behavior,

it is arguable that C.K.S.'s limitations in interacting and relating with others is severe.

The ALJ also found that C.K.S. has less than marked limitation in the ability to care

for himself.  Specifically, the ALJ determined that, although C.K.S. "has some difficulty

controlling his mood and impulses and in handling frustration appropriately," the "limitation

does not 'seriously interfere' with the claimant's functioning in the activities relevant to this

area." (R. 30.)    The domain of caring for yourself considers how well a claimant can maintain a healthy emotional and physical state, fulfill physical and emotional needs in appropriate ways, cope with stress and environmental changes, and take care of his or her own health, possessions, and living area.    20 C.F.R. § 416.926a(k).    This domain is characterized by a sense of independence.    *Id.* at § 416.926a(k)(1)(I).    The domain of caring for yourself also considers whether a claimant is "following safety rules, responding to circumstances in safe and appropriate ways, making decisions that do endanger [him], and knowing when to ask for help from others."    *Id.* at § 416.926a(k)(iv).    As previously discussed, the record indicates that either C.K.S.'s mother or a teacher's aide must sit with him at all times throughout the school day or walk with him to help him calm down.  (R. 153, 158-159, 172-173, 176, 178, 275.)  In addition, both the medical and school records indicate that C.K.S. runs out into the street because voices tell him to do so.  (R. 146, 159, 199, 241, 259, 268-269, 274-275, 277.)    The court, therefore, cannot conclude that the ALJ's determination that C.K.S. has less than a marked limitation in the ability to care for himself is supported by substantial evidence.

In order to fulfill his obligations, the ALJ must, at the very least, resolve the inconsistencies in the evidence, rather than selectively choosing items to support his decision. The court concludes that the ALJ failed to properly consider whether, at step three, C.K.S.'s impairments meet, medically equal or functionally equal the Listings.

**B.  Failure to properly weigh the evidence from treating physicians.**

The law in this Circuit is well-settled that the ALJ must accord "substantial weight" or "considerable weight" to the opinion, diagnosis, and medical evidence of the claimant's treating physician unless good cause exists for not doing so.  *Jones v. Bowen,* 810 F.2d 1001, 1005 (11th Cir. 1986); *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985).  The Commissioner, as reflected in his regulations, also demonstrates a similar preference for the opinion of treating physicians.

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultive examinations or brief hospitalizations.

*Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 CFR § 404.1527 (d)(2)).  It is not only legally relevant but unquestionably logical that the opinions, diagnosis, and medical evidence of a treating physician whose familiarity with the patient's injuries, course of treatment, and responses over a considerable length of time, should be given considerable weight.  *Smith v. Schweiker*, 646 F.2d 1075, 1081 (5th Cir. 1981).

The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion.  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983).  However, the ALJ must articulate the weight given to a treating physician's opinion and must articulate any reasons for discounting the opinion.  *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987).

As previously discussed, C.K.S. has received treatment at Montgomery Area Mental Health Authority on a routine and extensive basis throughout his childhood.  He has been prescribed antipsychotic medication since he was five years old.  The court recognizes that a consultative psychologist noted that C.K.S. did not exhibit signs of autism during the evaluation in 2009.  Nonetheless, the ALJ ignores mental health records indicating that C.K.S.'s condition substantially worsened after the 2009 consultative evaluation.  Moreover, the ALJ does not explain why he chose to ignore salient portions of the findings of mental health professionals, including C.K.S.'s treating psychiatrist, at Montgomery Area Mental Health Authority.  Specifically, the ALJ ignores those office notes that report an increase in problems, aggression, violence, and temper. It appears that the ALJ culled the record for selective references, ignoring comments that did not support his conclusions.

> If [the court is] to provide the parties with any sort of meaningful judicial review, we must be able to ascertain whether the ALJ correctly followed the law.  Unable to divine this from the ALJ's opinion, we must review . . . and remand the case for reconsideration by the ALJ, who should evaluate all the evidence according to the respective weight required by law and should render a decision that will provide reviewing courts with the basis for determining that he applied the correct standards.

*Wiggins v. Schweiker*, 679 F.2d 1387, 1390 (11th Cir. 1982).  Thus, the ALJ erred as a matter of law.

"Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits."  *Sims v. Apfel*, 530 U.S. 103, 110-111 (2000).

The SSA is perhaps the best example of an agency that is not based to a

> significant extent on the judicial model of decisionmaking.  It has replaced normal adversary procedure with an investigatory model, where it is the duty of the ALJ to investigate the facts and develop the arguments both for and against granting benefits; review by the Appeals Council is similarly broad. *Id*.  The regulations also make the nature of the SSA proceedings quite clear. They expressly provide that the SSA "conducts the administrative review process in an informal, nonadversary manner."  20 C.F.R. § 404.900(b).

*Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000).

For these reasons, the court concludes that the Commissioner erred as a matter of law, and that the case should be remanded for further proceedings.

## VI.  CONCLUSION

Accordingly, this case will be reversed and remanded to the Commissioner for further proceedings consistent with this opinion.

A separate order will be entered.

Done this 26th day of February, 2013.


_____/s/Terry F. Moorer_____
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE

29